# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

GILBERT DAVIS,             )
)
      Plaintiff,          )
)
      vs.               )     **Case number 4:11cv1437 TCM**
)
MICHAEL J. ASTRUE,       )
**Commissioner of Social Security,**  )
)
      Defendant.       )

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying the applications of Gilbert Davis (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b.[1] Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for DIB and SSI in October 2008, alleging he was disabled as of October 31, 2004, by arthritis in his knees and back and a gunshot wound to his left leg. (R.[2] at 102-09.) His applications were denied initially and after a video hearing held in June 2010

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

before Administrative Law Judge (ALJ) Joseph P. Donovan, Sr.[3] (Id. at 7-46, 79-94, 117-21.) The Appeals Council then denied Plaintiff's request for review, thereby effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel; ChukweEmeka Ezike, M.D., M.P.H., a medical expert; and James Radke, M.S., a vocational expert, testified at the administrative hearing.

At the hearing, Plaintiff stated that he was amending his alleged disability onset date to October 1, 2008. (Id. at 26, 101.)

Plaintiff testified that he was then working as a cook at a fast food restaurant. (Id. at 21.) He works fifteen to sixteen days a month and no more than four and one-half hours at a time. (Id. at 21, 26.) If the restaurant is not busy, he can sit during his shift. (Id. at 27.)

Plaintiff completed the eleventh grade. (Id.)

Dr. Ezike first noted that Plaintiff had a history of hypertension, bilateral degenerative joint disease, and atrial fibrillation. (Id. at 28.) He testified that he had reviewed Plaintiff's medical records and believed that, as of October 1, 2008, Plaintiff had the residual functional capacity (RFC) to lift at least twenty pounds occasionally and ten pounds frequently; to stand or walk for four to six hours in an day with breaks; to occasionally climb stairs and ramps; to occasionally bend, stoop, squat, and kneel; and to rarely crawl. (Id. at 29.) "He should be able

---

[3]Prior applications were filed in April 2006, September 1999, and December 1993 (Id. at 114.) Two were denied for, inter alia, failure or refusal to submit to a consultative examination. (Id.) The latest was denied following a hearing. (Id. at 129.)

to go to six hours in a day with breaks." (Id.) Plaintiff should not climb ropes, ladders, or scaffolds. (Id.)

He further testified that degenerative joint disease is typically painful. (Id. at 30.) The pain is usually worse with prolonged standing or walking and can interfere with sleep. (Id.) It is possible if it does interfere with sleep that a person would need to recline and sleep during the day to compensate for the missed sleep at night. (Id.) The pain from degenerative joint disease might also be relieved by reclining. (Id. at 30-31.)

Testifying as a vocational expert (VE), Mr. Radke stated that Plaintiff's past work as a mail carrier for a private company was semiskilled with a specific vocational preparation level[4] (SVP) of four and a medium physical demand level as Plaintiff performed it. (Id. at 31-32.) His job as a custodian in which he moved, repaired, and painted furniture was heavy as to the moving portion and medium to heavy as to the repair portion. (Id. at 32.) His job driving a truck was medium, semiskilled with a SVP of four. (Id. at 33.)

The ALJ then described to the VE the following hypothetical person of Plaintiff's age – one month shy of 50 years old.

> The person has a need for a sit-stand option, problems with the lower extremities, principally the knees because of degenerative disc disease will be taken in consideration of the following. The person is able to lift and carry occasionally 20 pounds, ten pounds frequently, sit six hours out of an eight-hour

---

[4]"The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation. 2 *Dictionary of Occupational Titles* [DOT] app. C at 1009 (4th ed. 1991)." **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).

day, stand and walk six hours out of an eight-hour day, but again, sit-stand option is required, and even though the person is currently working four hours a day, two and a half to three of which are standing, he has an opportunity to, and is given the opportunity to sit during periods of less activity and at least two breaks.  The use of hand and arm controls is repetitive.  Foot and leg controls is reduced to frequent, feeling repetitively, fingering repetitively, handling, reaching, including reaching overhead repetitive, ladders, ropes or scaffolds never, frequent ramps and stairs, balancing frequently, stooping only occasionally, kneeling only occasionally due to degenerative disc problems and joint problems in both knees, crouching occasionally, crawling never, again secondary to the knee problem.

(Id. at 33-34.)  The VE stated that such a person could not perform any of Plaintiff's past relevant work.  (Id. at 35.)  If this person was off-task five percent of the time due to drowsiness, there were jobs of general office clerks, security guard positions, and hand packer positions that the person could perform.  (Id. at 35-36.)  Asked to explain the discrepancy between the lack of a sit-stand option in the *Dictionary of Occupational Titles* (DOT) and his testimony, the VE replied that it was his 30-year experience that the jobs "by their nature" involved standing and sitting and that the person in these positions had some control over both.  (Id. at 36-37.)  Otherwise, his testimony was consistent with the DOT.  (Id. at 36.)

Plaintiff's counsel asked if the jobs cited by the VE would be available if, in addition to the limitations of the ALJ's hypothetical person, the person had to be away from the work station at times in excess of regularly scheduled breaks due to physical discomfort or sleepiness.  (Id. at 37-38.)  The VE replied that such a person would not be able to sustain employment.  (Id. at 38.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from health care providers, and assessments of his physical functional capacities.

When applying for DIB and SSI, Plaintiff completed a Disability Report. (Id. at 132-41.) He was 6 feet 1 inch tall and weighed 225 pounds. (Id. at 132.) Bad knees, arthritis in his back and knees, and a gunshot wound to his left leg limited his ability to work by preventing him from standing longer than twenty minutes and by not allowing him to bend over. (Id. at 133.) These impairments first bothered him in 1996 and prevented him from working on October 31, 2004. (Id.) He stopped working on that day when he was fired from a job because he was hurt and could not work. (Id.) He has completed the eleventh grade. (Id. at 140.) He takes a medication for high blood pressure prescribed by the doctors at the Federal Correctional Institute[5] (FCI) in Talladega, Alabama. (Id. at 139.) He takes four other medications, but cannot remember their names. (Id. at 141.)

Plaintiff also completed a Function Report, reporting that he lives in a halfway house[6] and arises at 5:45 a.m., eats breakfast, takes his medication, and then does his cleaning detail. (Id. at 150-57.) He walks around the back yard before having to take a nap because his medication makes him sleepy. (Id. at 150.) After taking his evening medication, he goes to

---

[5]Plaintiff was sentenced in August 2006 to a thirty-three month term of imprisonment after pleading guilty to a federal felony. See United States v. Davis, No. 4:06cr0090 DJS (E.D. Mo. 2006).

[6]Plaintiff explained on the form that he would be in the halfway house until January 2009.

bed.  (Id.)  Before his impairments, he could stand for longer than forty minutes.  (Id. at 151.)

His back pain makes him wake up during the night.  (Id.)  He has problems putting on his

pants, shoes, and slippers.  (Id.)  He also has bad headaches.  (Id.)  He has difficulty

remembering to take his evening medication so his roommate reminds him.  (Id. at 152.)  He

does his laundry and ironing and cleans his room; this takes him at least three hours once a

week.  (Id.)  He has difficulties sitting through a movie or sports game because he starts

hurting and has to get up and move around.  (Id. at 154.)  He goes to church and a drug

rehabilitation meeting every week.  (Id.)  The latter lasts four hours.  (Id.)  His impairments

affect his abilities to lift, squat, bend, stand, sit, kneel, climb stairs, remember, complete tasks,

and concentrate.  (Id. at 155.)  He can lift approximately thirty pounds without hurting and

walk for thirty minutes before needing to rest for ten minutes.  (Id.)  He can walk for thirty

minutes before having to rest for ten.  (Id.)  He can pay attention for five to ten minutes.  (Id.)

He tries to follow instructions, and does so well.  (Id.)  He does not finish what he starts.  (Id.)

He has problems getting along with authority figures.  (Id. at 156.)  He can handle changes in

routine better if he knows what they will be beforehand.  (Id.)  He wears glasses and knee

braces; sometimes, he uses a cane.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his

applications.  (Id. at 164-69.)  There had been no change in his impairments since he had

completed the initial report.  (Id. at 164.)

An earnings record generated for Plaintiff listed annual reportable earnings of $1946 in 2008 and nothing in 2005, 2006, and 2007. (Id. at 112.) His highest earnings were $14,656 in 1996. (Id.) His earnings between 1997 and 2004 never exceeded $8,090. (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin when Plaintiff was treated by Timothy G. Graven, D.O., for bilateral knee pain from August 7, 1999, to November 17, 1999. (Id. at 187-97.) Dr. Graven wrote on November 2 that the left knee pain had resolved; the right knee pain had not. (Id. at 186.) Plaintiff was scheduled for a magnetic resonance imaging of that knee. (Id.)

The next record is from 2006. On May 4 of that year, Plaintiff consulted Dr. Norfleet at People's Health Centers about his swollen and painful right knee. (Id. at 209-14, 441-43.) An x-ray revealed mild osteoarthritic changes, but no fracture. (Id. at 212.) Blood tests indicated rheumatoid arthritis. (Id. at 213-14.) Dr. Norfleet thought Plaintiff's high blood pressure might be contributing to his pain and told him to return in three weeks for a recheck of his blood pressure. (Id. at 210.)

It was noted on February 6, 2007, at Plaintiff's intake physical examination at FCI Talladega that he had hypertension and a history of gouty arthritis in his knees. (Id. at 264-65, 293-94.) The diagnosis of hypertension had been made two months earlier. (Id. at 265.) He had had arthroscopy on his left knee in 2000 due to arthritis. (Id.) On examination, his knees were not tender, swollen, or erythemic (flush). (Id. at 294) Plaintiff was placed on a diet low in salt and fat and was educated about arthritis. (Id.) One week later, his blood pressure was controlled. (Id. at 290.)

With the exception of no food service work, Plaintiff was assigned to regular duty.  (Id. at 236.)

On February 20, Plaintiff sought medical attention for pain in his right leg.  (Id. at 288.) On a scale of one to ten, with ten being the worst, the pain was an eight.  (Id.)  There were no deformities, muscle weakness, or swelling in his lower extremities.  (Id.)  Straight leg raises were negative.[7]  (Id.)  Sciatica was to be ruled out.  (Id.)  An x-ray of his lumbosacral spine was "unremarkable except for considerably [sic] narrowing of the intervertebral disc space at L5-S1."  (Id. at 247.)  Degenerative disc disease at that level was suspected.  (Id.)

When Plaintiff was seen on July 5 for complaints of a painful lesion on his left shoulder, it was noted that he was ambulatory and in no apparent distress.  (Id. at 282.)  The same notation was made three weeks later when Plaintiff consulted a physician's assistant about painful lesions on his left arm and back.  (Id. at 280.)

Plaintiff had no complaints when seen for a routine checkup on August 1.  (Id. at 278-79.)

It was noted in October in Plaintiff's medical records that he had a significant medical disorder under good control, but which would require follow-up care.  (Id. at 237.)  His diagnoses were hypertension, hyperlipidemia, and anemia.  (Id.)

---

[7]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended."  **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 n.3 (8th Cir. 2009) (internal quotations omitted).

Plaintiff next sought medical attention for his right leg on November 8 when he complained of a swollen knee that was painful when he stood or walked. (Id. at 275.) The knee was "moderately swollen" and with a good range of motion. (Id.) The knee was to be x-rayed; an ace wrap was issued. (Id.) The x-ray revealed evidence of a joint effusion associated with mild degenerative changes. (Id. at 244.) It was "otherwise unremarkable." (Id.) The following month, on December 3, Plaintiff reported that his right knee was still swollen and painful when he stood or walked. (Id. at 274.) His range of motion in the knee was limited secondary to pain. (Id.) Plaintiff was prescribed Naprosyn. (Id.)

When Plaintiff was next seen, on January 11, 2008, his right knee was still swollen and painful. (Id. at 273.) The following month, however, Plaintiff had a full range of motion in his lower extremities. (Id. at 271-72.)

Plaintiff sought medical attention on June 9 for swollen knees. (Id. at 268.) He reported that his left knee hurt when he walked. (Id.)

Plaintiff sought medical attention at St. Louis Connect Care ("SLCC") on October 30 for a knot on the back of his neck and a painful headache. (Id. at 313-17, 342-43, 364-67, 438-39.) He had no other complaints. (Id. at 316.) Plaintiff wished to have the mass excised, explaining that it interfered with resting his head and shaving. (Id. at 317.) A referral request was made for a surgical excision of the mass. (Id. at 374.)

One week later, he returned with complaints of left knee pain made worse with weight-bearing and was seen by Gina McCrary-Smith, D.O. (Id. at 333-34, 338, 373, 380-81, 418-19.) An x-ray revealed moderate osteoarthritis in his left knee. (Id. at 338, 423.)

On November 18, Plaintiff was seen by Laila Hanna, M.D., at SLCC for a follow-up of his hypertension.  (Id. at 330-32, 415-17, 450-52.)  It was noted that he had anterior left knee joint pain and pain in the patellofemoral region.  (Id. at 331.)  He was prescribed Naprosyn. (Id. at 332.)  One week later, Dr. McCrary-Smith prescribed cyclobenzaprine for his knee pain. (Id. at 328-29, 413-14, 453-54.)  Plaintiff's other medications included Lovastain (for high cholesterol); Lisinopril (for hypertension); hydrochlorothiazide (for hypertension); ecotrin (aspirin); iron pills; and Naprosyn.  (Id. at 328.)  His diagnosis history included hypertension, hyperlipidemia, status-post hernia repair, and status-post knee arthroscopy.  (Id.)

Plaintiff returned to SLCC on December 23 for a follow-up.  (Id. at 409-10, 470-71.) He was described as "doing well."  (Id. at 409.)  He had no chest pains, no shortness of breath, no headaches, no dizziness, and no blurred vision.  (Id.)  He was alert and oriented and was not in apparent distress.  (Id.)  In addition to the hypertension and hyperlipidemia, he was diagnosed with a sexually transmitted disease, "possibl[y] chlamydia," and was given an antibiotic.  (Id. at 410.)  Blood tests were negative for chlamydia.  (Id. at 481-83.)

On January 12, 2009, an excision of the mass on Plaintiff's neck was attempted but was stopped when he went into atrial fibrillation after anesthesia was begun.  (Id. at 371.)  Plaintiff had an electrocardiogram (EKG); the following day, he had a transthoracic echocardiogram. (Id. at 384-86.)  Two days later, Plaintiff saw Dr. McCrary-Smith for a referral to a cardiologist and a release to return to work.  (Id. at 389-90, 407-08, 457-58.)  He denied having any chest pain or discomfort.  (Id. at 389.)

Plaintiff returned to Dr. Hanna on April 3 for a hypertension follow-up. (Id. at 403-05, 459-61.) He had had one episode of palpitation after drinking ice water. (Id. at 404.) He was not having any sleep disturbances and was in no acute distress. (Id.) His gait, stance, and balance were normal. (Id.) Dr. Hanna discussed exercise and proper diet with him. (Id. at 405.)

Plaintiff was examined by a cardiologist on April 14. (Id. at 359-62.) He reported having sharp, stabbing chest pains once or twice a week that could last up to twenty minutes and palpitations two or three times a week. (Id. at 359.) He had stopped smoking cigarettes in 2006 and had stopped using heroin three years earlier. (Id.) It was noted that his EKG was normal. (Id. at 361.) An exercise stress test was to be performed and his dosage of Lisinopril was increased. (Id.)

The following month, Plaintiff had the exercise stress test. (Id. at 357, 432-37.) It was negative for ischemia. (Id.) His exercise tolerance was described as "good." (Id.) A radionuclide cardiac stress/rest study was not remarkable and revealed an ejection fraction of the left ventricle of 56 percent.[8] (Id. at 356, 431.)

Plaintiff saw Dr. Hanna again on December 15 after being treated in the emergency room for a bad headache and found to have high blood pressure. (Id. at 400-02, 462-64.) He had been off his medication for several months. (Id. at 400.) As before, he was reportedly not having any sleep disturbances and was described as being in no acute distress and with a

---

[8]"A normal [left ventricular] ejection fraction is 55 to 70 percent." Martha Grogan, M.D., Ejection fraction: What does it measure?, http://www.mayoclinic.com/health/ejection-fraction/AN00360 (last visited Aug. 16, 2012).

normal gait, stance, and balance.  (<u>Id.</u> at 401.)  He was continued on his current medication.  (<u>Id.</u>)

Plaintiff had a physical examination on February 22, 2010, by Dr. Hanna.  (<u>Id.</u> at 465-66.)  His active problems were hypertension and a sebaceous cyst (the growth on his neck).  (<u>Id.</u> at 465.)  He also needed a vaccine for hepatitis.  (<u>Id.</u>)  He had a "slight headache" and needed disability paperwork completed and a refill of his medications.  (<u>Id.</u>)  The only physical findings noted are of vitals, e.g., his blood pressure and weight.  (<u>Id.</u>)

Plaintiff saw Dr. Hanna again on March 24, reporting no palpitations and chest pain only with exertion.  (<u>Id.</u> at 467-68.)  He had received a "recall letter" with his blood tests results of the previous month.  (<u>Id.</u> at 467, 473.)  He was described as being in no acute distress and with a normal gait, stance, and balance.  (<u>Id.</u> at 467.)  Dr. Hanna's assessment was of chest pain; benign essential hypertension; hyperlipidemia; and herpes simplex types I and II.  (<u>Id.</u> at 468.)  Chest x-rays revealed (a) a moderate elongation of the aortic arch with a heart shadow at the upper limit of normal size and (b) moderate chronic interstital pulmonary inflammatory changes of the right lower lobe.  (<u>Id.</u> at 486.)

Also before the ALJ were assessments of Plaintiff's physical functional capacities.

In December 2008, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Micka Powell, who was a "single decisionmaker"[9] and not a

---

[9]<u>See</u> 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decisionmaker under proposed modifications to disability determination procedures).  <u>See also</u> **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

medical consultant.  (Id. at 347-52.)  The primary diagnosis was moderate osteoarthritis of the left knee; the secondary diagnosis was hypertension; and other alleged impairments included a sebaceous cyst.  (Id. at 347.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day.  (Id. at 348.)  His ability to push or pull was otherwise unlimited.  (Id.)  He had postural limitations of never climbing ladders, ropes, or scaffolds and only occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs.  (Id. at 349-50.)  He had no manipulative, visual, or communicative limitations.  (Id. at 350-51.)  He had an environmental limitation of needing to avoid hazards, e.g., machinery.  (Id. at 351.)

Dr. Hanna completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) for Plaintiff in February 2010.  (Id. at 447-49.)  She marked that his ability to lift and carry was not affected by his impairments but, due to moderate arthritis in his knee,[10] his ability to stand and walk was.  (Id. at 447.)  Specifically, he could walk and/or stand without interruption for a total of three to four hours.  (Id.)  He could not sit for longer than four hours without interruption because of his back.  (Id. at 448.)  He could occasionally climb, stoop, crouch, and kneel.  (Id.)  He could frequently balance.  (Id.)  He could not crawl. (Id.)  His ability to push was affected by his impairments; his abilities to reach, handle, feel, pull, see, hear, and speak were not.  (Id.)  Because of his knee and back pain, he needed to avoid heights.  (Id. at 449.)  Because of his allergies, he needed to avoid dust and fumes.  (Id.)

---

[10]She did not specify which one.

He could not engage in any activities that required standing, walking, and sitting for long periods of time. (Id.) His limitations began in 1995. (Id.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through March 31, 2008, and had not engaged in substantial gainful activity since his amended alleged onset date of October 1, 2008. (Id. at 12.) The ALJ next found that Plaintiff had a severe impairment of degenerative joint disease. (Id.) His hypertension, however, was not severe. (Id. at 13.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of listing-level severity. (Id.)

Addressing the question of Plaintiff's residual functional capacity (RFC), the ALJ found that he could lift and carry ten pounds frequently and twenty occasionally; could sit, stand, and walk for six hours in an eight-hour day with an at-will sit-stand option; could occasionally stoop, kneel, and crouch; could frequently balance and climb ramps and stairs; and should never climb ladders, ropes, or scaffolds. (Id.) He could "be on-task for at least 95% of the workday." (Id.)

In reaching his RFC finding, the ALJ considered Plaintiff's allegations about the extent of the effect of his impairments on his ability to function and found them not to be fully credible. (Id. at 14.) The ALJ noted that Plaintiff missed several appointments with specialists,[11] stated that he worked on the cleaning detail and walked around the yard, reported

---

[11]Specifically, Plaintiff missed a cardiology clinic appointment on March 10, 2009, and rescheduled for April; missed an orthopedic appointment on May 11, 2009; and missed a cardiology clinic appointment of July 27, 2009 (Id. at 378-79, 388.)

that he could do all his household chores, and requested a work release.  (Id.)  The ALJ further found that the Dr. Ezike's conclusions about Plaintiff's RFC were supported by the objective medical evidence, as were Dr. Hanna's opinions about his postural limitations.  (Id.)  Her opinions about his limitations on standing, walking, and sitting were not supported.  (Id.)  The ALJ noted that Plaintiff had been conservatively treated by Dr. Hanna and did not routinely complain about his joint pain.  (Id.)

With his RFC, Plaintiff was unable to return to his past relevant work.  (Id. at 15.)  With his age, limited education, and RFC, however, there were jobs that he could perform according to the VE's testimony.  (Id. at 15-16.)  Insofar as the VE's testimony was inconsistent with the DOT, the VE gave a reasonable explanation for the discrepancy.  (Id. at 16.)  Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir.

2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. Accord **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006). Conversely, "[a]n impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work . . . ." **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." **Id.** at 708 (internal citations omitted).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011). "'The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. [A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)) (second alteration in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2001). This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective

medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524, which cited Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'"  **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)).  After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. §§ 404.1520(f), 416.920(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If, [however,] after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

**Discussion**

Plaintiff argues that the ALJ erred by (1) not finding his subjective complaints to be fully credible; (2) failing to include exertional limitations in hi RFC assessment that would preclude even sedentary work; and (3) assigning greater weight to the opinion of Dr. Ezike than to that of his treating physician, Dr. Hanna.

As noted above, when assessing a claimant's RFC, ALJ must evaluate his credibility. And, when evaluating a claimant's subjective complaints, an ALJ may properly consider whether those complaints are supported by the objective medical evidence, although a lack of such support may not be the only reason for discounting his complaints. **Halverson v. Astrue**, 600 F.3d 922, 931-32 (8th Cir. 2010). "'A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms.'" **Martise**, 641 F.3d at 923 (quoting 20 C.F.R. § 404.1508) (alteration in original). <u>See also</u> 42 U.S.C. § 423(d)(5)(A) (requiring that a claimant's complaints of pain or symptoms not be conclusive evidence of disability but there also be "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques"). Pain is a symptom, not an impairment. <u>See</u> 20 C.F.R. §§ 404.1569a(a), 416.969a(a). As explained below, the ALJ did not err in finding Plaintiff's allegations of disabling pain not to be credible.

First, the lack of objective medical evidence supporting Plaintiff's subjective complaints may not be the sole basis for rejecting those complaints, but it is a proper consideration. <u>See</u> **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005). A month after his amended disability onset date, Plaintiff sought medical treatment

for left knee pain and was diagnosed with moderate osteoarthritis in that knee. Complaints of knee pain were noted in the records of two other medical visits that month. The following month, December, Plaintiff was reportedly doing well. He was routinely described by Dr. Hanna as having a normal gait and stance. He sought no treatment for back pain after his amended onset date.

Second, "'[an] ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole.'" **McCoy v. Astrue**, 648 F.3d 605, 614 (8th Cir. 2011) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004)). Plaintiff alleged he stopped working in October 2004 due to his knee and back pain and gunshot wound, but was working part-time in June 2010. He alleged back pain that woke him up at night, but never complained of such to a treating physician. He alleged difficulties sitting through a movie but attended weekly four-hour rehabilitation meetings. He reported occasional use of a cane, but was only noted after his onset date of October 2008 to have a normal stance, gait, and balance.

Third, Plaintiff's poor work history detracted from his credibility. See **Wildman v. Astrue**, 596 F.3d 959, 968-69 (8th Cir. 2010) (ALJ properly considered claimant's sporadic work history prior to her alleged onset date as detracting from her credibility); accord **Bradley v. Astrue**, 528 F.3d 1113, 1115 (8th Cir. 2008). And, he continued to work after his alleged disability onset date; indeed, he was working part-time at the time of the hearing and had requested a work release three months after his amended disability onset date. See **Medhaug v. Astrue**, 578 F.3d 805, 816 (8th Cir. 2009) (noting that a relevant factor in the ALJ's adverse credibility finding was the claimant continuing to work after the alleged onset of disability);

**Goff**, 421 F.3d at 792-93 (finding that when evaluating the claimant's credibility the ALJ properly considered the fact that the claimant worked with his allegedly disabling impairments for three years and had no evidence of any deterioration); <u>accord</u> **Blakeman v. Astrue**, 509 F.3d 878, 882 (8th Cir. 2007).

Fourth, a claimant's daily activities are proper considerations when evaluating his credibility. <u>See</u> **Buckner**, 646 F.3d at 558; **Halverson**, 600 F.3d at 932. Plaintiff reported doing a cleaning detail required for his halfway house residency. "'Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.'" **Medhaug**, 578 F.3d at 817 (quoting <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001)). Moreover, insofar as Plaintiff described limited daily activities, the ALJ was not obligated to accept that those limitations were caused by his medical impairments. <u>See</u> **Jones**, 619 F.3d at 975 (affirming adverse credibility determination of ALJ who found claimant's activities to be limited on a "self-imposed voluntary basis" rather than due to her medical condition); **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (finding ALJ's adverse credibility determination was supported by record, including the inconsistencies between claimant's "self-reported limitations on his daily activities" and the medical record).

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Juszczyk v. Astrue**, 542 F.3d 626, 632 (8th Cir. 2008) (quoting <u>Gregg v. Barnhart</u>, 354 F.3d 710, 714 (8th Cir. 2008)); <u>accord</u> **Buckner**, 646 F.3d at 558. Before beginning his analysis of Plaintiff's RFC, the ALJ noted that he had considered the factors outlined in Social Security Ruling 96-7p, 1996

WL 374186 (S.S.A. 1996), considerations which mirror the <u>Polaski</u> factors, see pages 17 to 18, supra.[12]  Although an ALJ must acknowledge and consider the relevant credibility factors, as did the ALJ in the instant case, the ALJ "'need not explicitly discuss each <u>Polaski</u> factor.'" **Wildman**, 596 F.3d at 968 (quoting <u>Goff</u>, 421 F.3d at 791); <u>accord</u> **Lowe v. Apfel**, 226 F.3d 969, 971-72 (8th Cir. 2000) (holding that although ALJ was required to make express credibility determinations, he "was not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [the claimant's] subject complaints").

Plaintiff argues that the ALJ also erred when assessing his RFC by not including postural limitations noted by Dr. Hanna.  In February 2010, Dr. Hanna assessed Plaintiff as being to walk and/or stand without interruption for three to four hours and to sit for four hours without interruption.  He had no limitations on his abilities to lift and carry.[13]  The ALJ found Plaintiff to have limitations in his ability to lift and carry.  The ALJ also found that Plaintiff could sit, stand, and walk for six hours in an eight-hour work day *with an at-will sit-stand option*.  This finding is not inconsistent with Dr. Hanna's assessment or with the record.  The ALJ further found that Plaintiff could "be on-task for at least 95% of the workday." (R. at 13.)  Plaintiff challenges this finding, citing his own testimony about needing two breaks every four hours.  He testified that he was *allowed* two breaks, see Record at 27, not that they were

---

[12]An ALJ's credibility findings are not negated by a failure to cite <u>Polaski</u> when the relevant factors are considered.  <u>See</u> **Buckner**, 646 F.3d at 559.

[13]Other limitations found by Dr. Hanna, e.g., Plaintiff could occasionally stoop, crouch, and kneel, were also found by the ALJ.

needed. He also testified that he was allowed to sit down when they were not busy because of his "medical problems." (Id.) A sit-stand option is not in conflict with this necessity.

Plaintiff next argues that the ALJ erred by not giving greater weight to Dr. Hanna's opinion and lesser weight to Dr. Ezike's opinion. Dr. Hanna was Plaintiff's treating physician; Dr. Ezike was a consulting specialist who had never examined Plaintiff.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson**, 600 F.3d at 929; **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir.2000)). See also 20 C.F.R. § 404.1527(d) (listing six factors to be evaluated when weighing opinions of treating physicians, including supportability and consistency).

Plaintiff saw Dr. Hanna three times before she completed her assessment. All three visits were for hypertension. At the first visit, in November 2008, Dr. Hanna noted that Plaintiff had left knee pain. At the next two visits, one in April 2009 and one in December 2009, she noted that he had a normal stance, gait, and balance and was in no acute distress.

When she saw him in February 2010 for a physical examination and to complete the Medical Source Statement, his only relevant active problem was hypertension. No findings about knee or back pain are noted.

"It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," **Davidson**, 578 F.3d at 843, or when it consists of conclusory statements, **Wildman**, 596 F.3d at 964. See also **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Kirby**, 500 F.3d at 709 (finding that ALJ was entitled to discount treating physician's statement as to claimant's limitations because such conclusion was based primarily on claimant's subjective complaints and not on objective medical evidence); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

Moreover, although "'[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence,'" **Jenkins v. Apfel**, 196 F.3d 922, 925 (8th Cir. 1999) (quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)) (alteration in original), "'[w]hen one-time consultants dispute a treating physician's opinion, [it is for] the ALJ [to] resolve the conflict between those opinions,'" **Wagner**, 499 F.3d at 849 (quoting Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000)).

Insofar as the ALJ's RFC findings may be construed to have incorporated Dr. Ezike's opinion and not Dr. Hanna's assessment, there is no error.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  29th  day of August, 2012.